IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GINA M. KOLLAR,<br>Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | 04 C 87 |
| GYMBOREE STORES, INC.,<br>Defendant. | )<br>)<br>) | |

## MEMORANDUM AND ORDER

Plaintiff Gina Kollar asserts that her former employer, Gymboree Stores, terminated her because she was pregnant. Gymboree's motion for summary judgment pursuant to Fed. R. Civ. P. 56 is before the court. Because the record shows that Gymboree's decision maker did not know that Kollar was pregnant when she decided to terminate her, Gymboree's motion is granted.

### I.    Background

The following facts are undisputed unless otherwise noted.[1]

### A.    The Parties

Gymboree is a specialty retainer which sells children's apparel and products. During 2000 and 2001, Felicia Urban managed the Water Tower store and plaintiff Gina Kollar and Ramona Venegas were assistant managers. Gymboree's Water Tower store is part of the Chicago district. During 2000 and 2001, Sharon Smith was the District Manager for the Chicago

---

[1] Kollar did not respond to Gymboree's statement of facts as required by Local Rule 56.1(b)(3). Accordingly, the facts in Gymboree's statement will be accepted as true to the extent that they are supported by the record. See Local Rule 56.1(b)(3) ("[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the moving party").

district, and Michelle Gaby was the acting Regional Director with responsibility for stores in Indiana, Illinois, and Missouri.

Kollar began working for Gymboree in December of 1998. Gymboree promoted her to the position of assistant manager at the Water Tower store in June of 1999. Kollar gave birth to her first child on May 23, 2000. She took a twelve-week maternity leave and returned to her position as assistant manager in August of 2000. Her supervisors did not make any negative comments about her pregnancy or maternity leave. In January of 2001, Kollar learned that she was again pregnant when she took a home pregnancy test. She gave birth to her second child on September 19, 2001.

### B. Gymboree's Bank Deposit Policy

Gymboree has a policy which requires stores to deposit money in the cash drawer every day. Failure to make daily bank deposits may result in disciplinary action up to and including termination. Kollar admitted that she was aware of and understood this policy.

In the Fall of 2000, Gymboree's loss prevention department determined that bank deposits were not being consistently made every day across the entire company. As a result of that discovery, Gymboree's Vice President of Sales held a conference call with the regional managers, including Gaby, to remind everyone of the importance of making daily bank deposits. In addition, on December 13, 2000, Gymboree sent out a national, store-wide voicemail message reminding store managers that it was imperative for them to make daily bank deposits during the busy holiday season. The message also stated that failure to follow the policy regarding bank deposits would result in corrective action, up to and including termination. Kollar does not recall listening to the message, but has no reason to doubt that she received it.

## C. The 2001 Audit of the Water Tower Store

During the week of January 17, 2001, two of Gymboree's corporate buyers toured the Chicago stores with Smith and Gaby. During the visits, Gaby noticed that several stores in the Chicago district were not functioning up to Gymboree's standards. Gaby decided to do an intensive series of store audits with Smith to identify improvement areas for each store.

On January 23, 2001, Gaby and Smith arrived at the Water Tower store to begin their unannounced store audit, and Gaby went to the office in the back to begin the audit. She found a stack of deposit slips and noted that many of the deposits had been made on the same day. Gaby then asked Kollar to open the safe. When Kollar did so, Gaby found six deposit bags. Gaby asked Kollar how often bank deposits were made, and Kollar told her, "not enough" because they were made "every few days." Kollar also acknowledged that Gymboree's bank deposit policy required that bank deposits be made daily, but stated that she had become "rebellious" regarding the deposits because took them into the bank more than the other managers at the Water Tower store.[2]

Gaby immediately told Kollar how serious the situation was and asked Kollar if she knew that she could get terminated for failing to follow the bank deposit policy. Kollar answered, "yes." Gaby then asked Kollar to write a statement explaining her actions. Kollar wrote that:

> I know and understand as a manager that I am required to drop the bank deposits. I should go to the bank every day because it is a store policy and a violation if you don't go. For a long time[,] I felt that I was the only one going to the bank. Instead of going to my store manager or district manager about this[,] I didn't go each time that I should [have]. I understand that this is wrong and a very serious issue . . . . There is no excuse for not doing exactly what the company policy is. I

---

[2] However, at her deposition, Kollar testified that she often made deposits in groups and that her supervisors knew this and never objected.

3

would be devastated to lose my job that I love because I was ignorant and did not
follow policy. I promise that with this warning . . this will never happen again
nor any other violation of store policy.

Kollar agrees that her statement was true and accurate when she wrote it.

While Kollar wrote her statement, Gaby reviewed the store's schedule and observed that two management employees (Urban and Kollar) were consistently opening and closing the store. She thus determined that the staffing allowed bank deposits to be made every day. Gaby also spoke with Venegas, another assistant store manager, who told Gaby that she had never opened or closed the store on her own.

At 1:00 that day, Urban, the store manager, reported for work. Gaby asked Urban why the deposits were not being made every day, and Urban stated, "I cannot follow my assistant managers around every day to make sure they [do] their job." Gaby asked Urban to write a statement about the bank deposit situation. Urban acknowledged that she knew that the deposits were supposed to be dropped off every day but that she had recently dropped off four or five at a time when she was responsible for closing the store.

### D. Kollar's Termination

After gathering the statements, Gaby and Smith left the store for the day. Gaby contacted Gymboree's human resources department to explain her findings. Smith compared the deposits with the store schedules and determined that Urban and Kollar had opened and closed the store on the days that deposits were not made, and that Venegas had never opened or closed the store on her own.

Gaby and representatives from Gymboree's human resources department decided to terminate Urban and Kollar's employment because they had violated the bank deposit policy.

4

Gaby and the human resources employees considered disciplining Venegas but did not plan to discipline her as severely as Urban and Kollar because the schedules confirmed that Venegas had never opened and closed the store by herself, she was a relatively new manager, and she was unaware of the daily bank deposit policy.

On January 24, 2001, Gaby terminated Urban and stated that she had done so because Urban had failed to make bank deposits on a daily basis. Roughly thirty minutes later, Kollar telephoned Gaby at the Water Tower store. Kollar told Gaby that she did not want to drive into the city if Gaby was just going to fire her. Gaby consulted with the human resources department to see if she could fire Kollar over the phone and was told she could. Thus, when Kollar called Gaby back, Gaby terminated Kollar, stating that she was doing so because Kollar had violated the bank deposit policy. On February 8, 2001, Kollar signed her termination report. The report stated that she had been terminated because she failed to comply with company policies regarding daily bank deposits.

Kollar never told Gaby that she was pregnant, and Gaby never knew that Kollar was pregnant. In addition, Kollar never told Smith or anyone in Gymboree's corporate office that she was pregnant. Kollar admits that she has no evidence that Gaby knew that Kollar was pregnant at the time of her termination. Smith may have known that Kollar was pregnant as Urban told Smith this fact soon after Kollar obtained a positive home pregnancy test. Kollar believes that she and Urban were terminated due to their pregnancies because Venegas, who was not pregnant, was equally responsible for making the bank deposits but was not fired.

## II. Standard for a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992). The nonmoving party, however, may not merely rest upon the allegations or details in her pleadings, but instead, must set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Electronics, Inc.*, 856 F.2d 920, 922 (7th Cir. 1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *See Sarsha v. Sears, Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

## III. Discussion

The Pregnancy Discrimination Act amended Title VII to establish that pregnancy discrimination falls within the ambit of Title VII's prohibition on sex discrimination. *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005 (7th Cir.2001). The Act provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

To establish that Gymboree discriminated against her because of her pregnancy, Kollar may point to either direct or indirect evidence of discrimination. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Where, as here, an employee relies on the indirect method, she must first establish a prima facie case by showing that: (1) she was pregnant and her employer knew she was pregnant; (2) she was performing her duties satisfactorily; (3) she was discharged; and (4) similarly situated employees not in the protected class were treated more favorably. *Clay v. Holy Cross Hospital*, 253 F.3d at 1005. If Kollar presents a prima facie case, the burden of production shifts to Gymboree to present a legitimate, nondiscriminatory reason for her discharge. *Id.* If Gymboree does so, Kollar must then prove by a preponderance of the evidence that Gymboree's reason for discharge was a pretext for intentional discrimination. *Id.*

An employer necessarily cannot discriminate against an employee based on the employee's pregnancy if the employer does not know that the employee is pregnant. *See id.* In this case, the court's analysis thus begins and ends with the first element of the prima facie case: whether Gaby, the decision-maker, knew that Kollar was pregnant when Gaby decided to terminate Kollar. Kollar does not dispute that Gaby was responsible for the decision to terminate her. Kollar's failure to respond to Gymboree's statement of facts means that she has also admitted that she never told Gaby that she was pregnant and that Gaby did not know that she was pregnant at the time of Kollar's termination. These admissions doom her pregnancy discrimination claim as she cannot establish a prima facie case of pregnancy discrimination if Gymboree's decision maker did not know about her pregnancy. *See id.*

Despite Kollar's failure to oppose Gymboree's statement of facts, she nevertheless has filed a statement of additional facts which point to evidence purportedly proving that Gaby knew about Kollar's pregnancy. This leave the court with an interesting procedural conundrum: what happens when a party admits certain facts by failing to respond to a Rule 56.1 statement but then attempts to contest those facts by filing a statement of additional facts which address the same facts that have already been admitted? The court need not grapple with this question for long because, as discussed below, Kollar has admitted that she lacks any direct evidence that Gaby knew about Kollar's pregnancy and the additional evidence presented by Kollar on this point is speculative and thus insufficient to withstand summary judgment.

Specifically, Kollar first contends that Gaby must have known that Kollar was pregnant because Urban told Smith this fact, and Smith was Gaby's subordinate. The court, however, is not required to accept Kollar's unsupported conjecture that Smith must necessarily have told Gaby about Kollar's pregnancy. *See Clay v. Holy Cross Hospital*, 253 F.3d at 1006 (decision maker's presence at a conference where the plaintiff's husband announced the plaintiff's pregnancy did not justify the inference that the decision maker had heard or knew about the pregnancy announcement).

Second, Kollar contends that Gaby must have known about Kollar's pregnancy because Gaby and Smith arrived for the audit only days after Urban told Smith about Kollar's pregnancy. This assertion, like Kollar's belief that Smith must have told Gaby about Kollar's pregnancy, is not based on any concrete evidence. This is especially true given that there is a valid reason in the record explaining the timing of the audit (the undisputed fact that two of Gymboree's corporate buyers, Gaby, and Smith toured the Chicago stores in January of 2001 and found that

8

several stores were not functioning up to Gymboree's standards, and Gaby wanted to follow up to bring the stores into compliance). The court respects the sincerity of Kollar's belief as to why she was terminated. Nevertheless, a sincere belief which is unsupported by any admissible evidence is not enough to show that there is a genuine issue for trial and thus is not enough to withstand summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

Third, Kollar contends that all of the managers at the Water Tower store were equally responsible for failing to make daily deposits but Gaby only fired the two pregnant managers (Urban and herself). According to Kollar, Venegas, who was not pregnant, was equally responsible but was not disciplined so Gaby must have known about Kollar's pregnancy and must have been trying to discriminate against the pregnant employees. In response, Gymboree notes that Gaby considered disciplining Venegas but felt Venegas was not as culpable as Urban and Lollar because Venegas had never opened and closed the store by herself, was a relatively new manager, and did not know about the daily bank deposit policy.

Again, Kollar's rationale for her belief that Gaby knew of her pregnancy is based on conjecture as opposed to specific evidence. This court, however, cannot sit as a superpersonnel department and find that a fact question exists as to the rationale behind an employer's disciplinary decision based on an employee's sense that she was wronged. *See Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1146 (7th Cir.1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives. There would be no summary judgments in . . . discrimination cases")

Finally, Kollar stresses that the EEOC found that there was reasonable cause to believe that her charge of employment discrimination was true. Based on the EEOC's findings in her favor, Kollar argues that there is a triable issue of fact as to whether Gaby fired her due to her pregnancy. The Seventh Circuit has expressly rejected this argument as it has held that a determination of reasonable cause to believe that an employment discrimination charge is true is merely an administrative prerequisite to filing a complaint in federal court and has no legally binding significance in subsequent litigation. *E.E.O.C. v. Harvey L. Walner & Associates*, 91 F.3d 963, 968 n.3 (7th Cir. 1996); *E.E.O.C. v. Caterpillar Inc.*, 336 F.Supp.2d 858, 865 (N.D. Ill. 2004). Thus, the EEOC's finding of probable cause cannot serve as a ticket that automatically entitles Kollar to a trial.

## IV. Conclusion

The record fails to show that Gymboree knew that Kollar was pregnant when it decided to terminate her. Accordingly, Kollar has failed to establish a prima facie case of discrimination so Gymboree's motion for summary judgment is granted.

DATE: 3/24/05

Blanche M. Manning
U.S. District Court Judge